# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### COLUMBUS DIVISION

| | |
|---|---|
| **NINA N. NIXON**<br>972 East 19th Avenue<br>Columbus, OH 43211<br><br>        Plaintiff,<br><br>  v.<br><br>**NEW PENN FINANCIAL, LLC d.b.a.**<br>**SHELLPOINT MORTGAGE**<br>**SERVICING**<br>4000 Chemical Road, Suite 200<br>Plymouth Meeting, PA 19462<br><br>        Defendant. | Civil Case No.<br><br><br><br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY DEMAND ENDORSED HEREON** |

Plaintiff Nina N. Nixon, through counsel, states as follows for her *Complaint for Damages* (the "Complaint") against Defendant New Penn Financial, LLC d.b.a. Shellpoint Mortgage Servicing:

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Nina Nixon ("Plaintiff" or "Nixon") is the owner of the real property and improvements located thereupon located at and commonly known as 972 East 19th Avenue, Columbus, OH 43211 (the "Home").

2.    Nixon currently occupies and maintains the Home as her primary, principal residence and has maintained the Home as such for all times relevant to the causes of action pleaded in this Complaint.

3.    Non-party John Nixson a.k.a. John Nixon ("Mr. Nixon") owned the Home until his passing on or about August 6, 2018.

4.      On December 26, 2001, Mr. Nixon. executed a promissory note in the amount of $66,600.00 (the "Note") and a mortgage on the Home purportedly securing the Note (the "Mortgage") (collectively, the "Loan"). *See*, a copy of the Loan, attached as **Exhibit 1**.

5.      Upon Mr. Nixon's passing, intestate, ownership of the Home transferred through probate in equal shares to Nixon, non-party Elizabeth A. Nixon ("Elizabeth"), and non-party Michael Nixon ("Michael"). *See*, a copy of the *Certificate of Transfer* from the Home filed with the office of the Franklin County Auditor on or about October 23, 2018, attached as **Exhibit 2**.

6.      Elizabeth transferred her entire interest in the Home to Nixon via Quit Claim Deed executed November 1, 2018 and filed with the office of the Franklin County Auditor on or about November 18, 2018 (the "First Deed"). *See*, a copy of the First Deed, attached as **Exhibit 3**.

7.      Michael transferred his entire interest in the Home to Nixon via Quit Claim Deed executed November 26, 2018 and filed with the office of the Franklin County Auditor on or about December 10, 2018 (the "Second Deed") (the *Certificate of Transfer*, the First Deed, and the Second Deed shall be collectively referred to hereinafter as the "Transfer Documents"). *See*, a copy of the Second Deed, attached as **Exhibit 4**. As a result of these transfers, Nixon became and remains the sole owner of the Home.

8.      Defendant New Penn Financial, LLC d.b.a. Shellpoint Mortgage Servicing ("Defendant" or "Shellpoint") is a foreign corporation registered to do business in the State of Ohio, with its corporate headquarters located at 4000 Chemical Road, Suite 200, Plymouth Meeting, PA 19462.

9.      Shellpoint is the current servicer of the Loan and has serviced the Loan since January 8, 2019.

10. Shellpoint services the Loan on behalf of the purported assignee of the Loan, non-Party Citibank, N.A. not in its individual capacity but solely as Owner Trustee for New Residential Mortgage Loan Trust 2018-2 ("Citi"), and previously serviced the Loan on behalf of the preceding purported assignee of the Loan, non-Party U.S. Bank National Association, not in its individual capacity but solely as Trustee of NRZ Inventory Trust ("USBNA"), and has acted with its authority or otherwise on its behalf in relation to the Loan at all times relevant to this Complaint.

11. Jurisdiction is conferred by 28 U.S.C. § 1331 as this action primarily arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA), the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq.* (RESPA) and the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692k(d), *et seq.*.

12. This Court has supplemental jurisdiction to hear any state law statutory and common law claims pleaded, *infra,* or that otherwise may arise pursuant to 28 U.S.C. § 1367.

13. Venue is appropriate within this District pursuant to 28 U.S.C. § 1391(b) as: (1) A substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District; and, (2) the Home, the property that is the subject of the action, is located within this District.

## SUMMARY OF CLAIMS

14. Nixon files this action in substantial part to enforce regulations promulgated by the Consumer Financial Protection Bureau (CFPB) and implemented pursuant to 12 U.S.C. § 2605(f) that became effective on January 10, 2014, specifically, 12 C.F.R. § 1024.1, *et seq.* ("Regulation X").

15. In January 2013, the CFPB issued final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111-203, 124 Stat. 1376 (2010).

16. Specifically, on January 17, 2013, the CFPB issued the Real Estate Settlement Procedures Act Mortgage Servicing Final Rules, 78 F.R. 10695 (Regulation X) (February 14, 2013) which became effective on January 10, 2014.

17. Mortgage servicers are prohibited from failing "to comply with any other obligation found by the [CFPB], by regulation, to be appropriate to carry out the consumer protection purposes of [RESPA]." 12 U.S.C. § 2605(k)(1)(E).

18. Mortgage servicers are prohibited from failing "to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties[1]." 12 U.S.C. § 2605(k)(1)(C).

19. The Loan is a "federally related mortgage loan" as said term is defined by 12 C.F.R. § 1024.2(b).

20. Shellpoint is subject to the aforesaid regulations and does not qualify for the exemption for "small servicers", as defined in 12 C.F.R. § 1026.41(e)(4).

21. Shellpoint is not a "qualified lender", as defined in 12 C.F.R. § 617.700.

---

[1] "The Bureau believes that standard servicer duties are those typically undertaken by servicers in the ordinary course of business. Such duties include not only the obligations that are specifically identified in section 6(k)(1)(C) of RESPA, but also those duties that are defined as ''servicing'' by RESPA, as implemented by this rule, as well as duties customarily undertaken by servicers to investors and consumers in connection with the servicing of a mortgage loan. *These standard servicer duties are not limited to duties that constitute ''servicing,'' as defined in this rule, and include, for example,* duties to comply with investor agreements and servicing program guides, to advance payments to investors, to process and pursue mortgage insurance claims, to monitor coverage for insurance (e.g., hazard insurance), to monitor tax delinquencies, to respond to borrowers regarding mortgage loan problems, to report data on loan performance to investors and guarantors, *and to work with investors and borrowers on options to mitigate losses for defaulted mortgage loans*." 78 Fed. Reg. 10696, 10739 (emphasis added).

22.     Nixon asserts a claim for relief against Shellpoint for violations of the specific rules under RESPA and Regulation X, as set forth, *infra.*

23.     Nixon has a private right of action under RESPA pursuant to 12 U.S.C. § 2605(f), for the violations claimed, *infra*, and such actions provide for remedies including actual damages, statutory damages, and attorneys' fees and costs. Shellpoint is a "consumer", as that term is defined by 15 U.S.C. § 1692a(3), and a person affected by a violation of the FDCPA, and other violations, with standing to bring this claim under 15 U.S.C. § 1692.

24.     Shellpoint is a "debt collector" as defined by 15 U.S.C. § 1692a(6) as Shellpoint began collecting on the Loan when the Loan was in default. Shellpoint regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another, such as Citi.

25.     The Loan is a "debt" as that term is defined by the FDCPA as the underlying debt sought to be collected by Shellpoint was a residential mortgage the primary purpose of which was for personal, family, or household use.

26.     Nixon asserts a claim for relief against Shellpoint for violations of the specific rules under the FDCPA, as set forth, *infra.*

27.     Nixon further asserts a state law statutory claim for violations of the Residential Mortgage Lending Act, R.C. 1322.01, *et seq.* (RMLA).

28.     Shellpoint is subject to the requirements of the RMLA and does not qualify for the exemptions listed in R.C. 1322.04.

29.     Shellpoint is a mortgage servicer under the RMLA as it "holds the servicing rights, records mortgage payments on its books, or performs other functions to carry out the mortgage holder's obligations or rights under the mortgage agreement." R.C. 1322.01(AA).

## FACTUAL BACKGROUND

30.     After Mr. Nixon's death, Nixon, as a successor in interest, suffered financial difficulties and was unable to maintain payments on the Loan resulting in a default thereunder.

31.     USBNA initiated foreclosure proceedings against Nixon in the Court of Common Pleas for Franklin County, Ohio, in the matter stylized as *U.S. Bank National Association, not in its individual capacity but solely as Trustee of NRZ Inventory Trust v. Nina Nancijean Nixon, etc.*, et al., Case No. 19 CV 006239, seeking to foreclose on the Loan and sell the Home (the "Foreclosure").

32.     USBNA has alleged in the Foreclosure that the Loan has been in default since August 1, 2018.

33.     Citi moved to substitute as plaintiff in the Foreclosure on or about December 22, 2020, which remains pending as of the date of this Complaint.

34.     In 2019, Nixon, as a confirmed successor in interest[2], submitted a loss mitigation application to Shellpoint seeking to obtain a loan modification for the Loan (the "Application").

35.     Nixon had not submitted a complete loss mitigation application as a successor in interest to Shellpoint prior to remitting the Application.

36.     On or about September 30, 2019, Shellpoint sent correspondence approving Nixon for a Trial Period Plan for a loan modification (the "TPP"). *See*, a copy of the TPP, attached as **Exhibit 5**.

37.     Per the terms of the TPP, Nixon was required to remit six (6) monthly payments each in the amount of $255.08 beginning on November 1, 2019. *See*, Exhibit 5.

---

[2] "A confirmed successor in interest shall be considered a borrower for purposes of § 1024.17 and this subpart." 12 C.F.R. § 1024.30.

38.     The Borrower timely remitted each payment due and owing under the TPP.

39.     Despite Nixon having already been approved for the TPP and remitting all necessary payments thereunder, on or about May 4, 2020, Shellpoint sent correspondence to Nixon stating:

> You were evaluated for a mortgage payment assistance based on the eligibility requirements of New Residential Mortgage Loan Trust 2018-2 800-422, the owner of your mortgage loan. [Shellpoint] evaluated you for the following loan modification product(s). Based on our review of your loan, property and financial circumstances, you are not eligible for the following loan modification due to the following reason(s):
> - Standard Modification - Your application for a workout was denied because you do not meet the requirements to qualify.

*See*, a copy of the May 4, 2020 correspondence ("the "Denial"), attached as **Exhibit 6**.

40.     On or about October 6, 2020, Nixon, through Attorney Patrick W. Skilliter of The Legal Aid Society of Columbus, Nixon's counsel in the Foreclosure, sent correspondence to Shellpoint at the address Shellpoint designated for the receipt of requests for information pursuant to 12 C.F.R. § 1024.36(b) and notice of error pursuant to 12 C.F.R. § 1024.35(c) (the "Designated Address") via Certified U.S. Mail captioned "Notices of Error and Request for Information, 12 C.F.R. §§ 1024.35 and .36" (the "NOE"). *See*, a copy of the NOE, without enclosures, attached as **Exhibit 7**.

41.     Through the NOE, Nixon alleged that Shellpoint committed errors in relation to the Loan, specifically in Shellpoint's handling of the TPP and loss mitigation process at large, by:

a.     Rejecting an attempted seventh payment by Nixon in furtherance of the terms of the TPP in May 2020;

b.     Making misrepresentations that Nixon's loss mitigation file was closed for failing to return an assumption agreement;

    c.    Making misrepresentations about the loss mitigation process and the TPP by advising Nixon that Shellpoint would be sending an assumption agreement and permanent modification on numerous occasions; and,

    d.    By demanding a lump sum payment for payments due under the TPP from May 2020 through October 2020 in order to receive a permanent modification.

*See*, Exhibit 7.

42.      Through the NOE, Nixon requested that Shellpoint provide the following information related to the Loan:

1. A complete copy of [Nixon's] loss mitigation file, including all reviews, reports, calculations, communications, draft agreements, and other documents related to [the Application].
2. Copies of all rules, regulations, and guidelines related to loss mitigation that apply to [the Loan].
3. Internal communications regarding [the Loan] to which KaTesha Owens [or] Eber Avalr, were parties.

*See*, Exhibit 7.

43.      Shellpoint received the NOE at the Designated Address within a week of mailing.

44.      On or about October 19, 2020, Shellpoint sent correspondence stating:

Thank you for contacting us about an assumption of mortgage. You were evaluated for an assumption based on the eligibility requirements of New Residential Mortgage Loan Trust 2018-2 800-422, the owner of [the Loan].

Based on our review of your [Loan], you are not eligible for an assumption due to the following reasons:
- [Nixon] is not eligible because the [Loan] contains a due-on-sale clause.

*See*, a copy of the October 19, 2020 correspondence, attached as **Exhibit 8**.

45.      On or about October 22, 2020, Shellpoint sent correspondence in response to the NOE (the "Response"). *See*, a copy of the Response, attached as **Exhibit 9**.

46.     Shellpoint, through the Response, Shellpoint stated that it had not committed any error in relation to the loss mitigation process for the Loan, specifically:

> As [Nixon] is not the homeowner of the [Home], Shellpoint must get the approval for [Nixon] to assume the mortgage under the new payment terms. After [Nixon] completed the [TPP], Shellpoint submitted the request for [Nixon] to assume the [L]oan to the investor of the [L]oan...the request to assume the mortgage was denied as the Federal Truth in Lending Disclosure Statement states: *Someone buying your home cannot assume the remainder of the mortgage on the original terms*...a modification would simply modify the original terms of payment of the [L]oan but does not overrule the original signed agreement.

*See*, Exhibit 9.

47.     Shellpoint's statements through the Response that "Nixon is not the homeowner" and reliance upon a due-on-sale clause stating that "someone buying your home cannot assume the remainder of the mortgage on the original terms" are incorrect, misguided, and misleading as Nixon is the owner of the Home through the Transfer Documents and Nixon did not purchase or attempt to purchase the Home. *See*, Exhibits 2, 3, 4, 7 and 9.

48.     Further, the Loan's due-on-sale clause is inapplicable as to the instant circumstances pursuant to the Garn-St. Germain Depository Institutions Act, which prohibits the application of a due-on-sale clause upon "a transfer to a relative resulting from the death of a borrower" or upon "a transfer where the...children of the borrower become an owner of the property". 12 U.S.C. § 1701j-3(d)(5); *see*, Exhibits 2, 3, and 4.

49.     Shellpoint further denied making misrepresentations as to the loss mitigation process for the Loan stating that "Shellpoint's intention was not for [Nixon] to believe the loan modification was approved upon receiving the [TPP], as the [L]oan must go through additional verification before the final approval", but this statement, and the remainder of the response completely disregards and fails to mention other misrepresentations including that Nixon was

advised on multiple occasions that Shellpoint would be sending an assumption agreement and permanent loan modification for execution and that Nixon was advised to make a lump sum payment of the amounts due in furtherance of the TPP since May 2020. *See*, Exhibits 7 and 9.

50.     To date, despite Nixon qualifying for the TPP based upon a review of her financial circumstances and despite Nixon's satisfaction of the terms of the same, the Loan has not been modified, the Foreclosure persists, and Nixon remains at risk of losing her Home to foreclosure sale.

## IMPACT AND DAMAGES

51.     Upon information and belief, had Shellpoint acted appropriately, it is likely, if not certain, that Nixon would have received a permanent loan modification.

52.     Due to Shellpoint's actions, Nixon has unnecessarily been deprived of an expected loan modification that would save her Home from foreclosure judgment and sale.

53.     Shellpoint has denied Nixon the complete transparency contemplated by Regulation X, and, as a result, has been forced to make critical financial decisions regarding her Home and financial well-being with incomplete information, hampering and delaying Nixon's abilities to make financial decisions relative to the disposition of her Home, causing Nixon to remain in an unnecessary financial and emotional limbo for longer than she would have had Shellpoint acted in conformance with RESPA and other applicable laws and regulations.

54.     Shellpoint's improper actions have further caused Nixon to suffer from other damages including:

> a.   The loss of funds, the loss of use funds, and the time loss of funds in the amount of $1,530.48—six (6) payments of $255.08 due under the TPP—without

receiving the benefit of the permanent modification to which Nixon would have been entitled but for the wrongful actions of Shellpoint;

b.  Loss of time and money for continued defense of the Foreclosure which would not still be pending but for Shellpoint's actions in mishandling the loss mitigation and error resolution processes concerning the Loan in violation of RESPA and Regulation X and mortgage servicing guidelines;

c.  Improper fees and charges imposed on the Loan due to the unnecessarily continued Foreclosure for which Nixon will become personally obligated should she eventually obtain a loan modification or which otherwise negatively impact any equity in the Home to which she is entitled; and,

d.  Severe emotional distress driven by Shellpoint's actions and by the tangible fear that Shellpoint's refusal to properly handle the loss mitigation and error resolution processes related to the Loan will result in the imminent loss of her Home to foreclosure sale, which has resulted in frustration, loss of sleep, anxiety, depression, embarrassment, and other significant emotional distress above and beyond the emotional distress caused by the foreclosure from which she was suffering prior to the conduct alleged in this complaint.

55.  Had Shellpoint properly handled the loss mitigation and error resolution processes in relation to the Loan, Nixon would have been put in the place she should have been but for Shellpoint's errors, but Shellpoint has failed to rectify their actions.

## PATTERN AND PRACTICE OF REGULATION X VIOLATIONS

56.     Shellpoint's actions are part of a pattern and practice of behavior in violation of Nixon's rights and in abdication and contravention of Shellpoint's obligations under the mortgage servicing regulations set forth in Regulation X of RESPA.

57.     As of the filing of this Complaint, consumers nationwide have lodged Five Hundred Eighty-Four (584) complaints with the CFPB against Shellpoint, specifically concerning the issue identified on the CFPB's consumer complaint database as "Loan modification, collection, foreclosure" related to mortgages. Each such complaint is filed and cataloged in the CFPB's publicly accessible online database which can be accessed at: http://www.consumerfinance.gov/data-reseraach/consumer-complaints.

58.     As of the filing of this Complaint, consumers nationwide have lodged Four Seventy-Nine (479) complaints with the CFPB against Shellpoint, specifically concerning the issue identified on the CFPB's consumer complaint database as "Loan servicing, payments, escrow account" related to mortgages. Each such complaint is filed and cataloged in the CFPB's publicly accessible online database which can be accessed at: http://www.consumerfinance.gov/data-research/consumer-complaints.

59.     As of the filing of this Complaint, consumers nationwide have lodged Nine Hundred Seventy-Eight (978) complaints with the CFPB against Shellpoint, specifically concerning the issue identified on the CFPB's consumer complaint database as "Struggling to pay mortgage" related to mortgages. Each such complaint is filed and cataloged in the CFPB's publicly accessible online database which can be accessed at: http://www.consumerfinance.gov/data-research/consumer-complaints/.

60.     Nixon has reviewed the CFPB's consumer complaint database and has identified other similar alleged RESPA violations by Shellpoint against other borrowers. In particular, Nixon has reviewed the fifteen (15) consumer complaints attached hereto and identified as **Group Exhibit 10**. The date, details, and a narrative disclosed by the consumer is set forth in each complaint. The complaints show conduct which demonstrates that Shellpoint has engaged in a pattern or practice of violating RESPA with respect to other borrowers.

## COUNT ONE:
## VIOLATION OF 12 C.F.R. § 1024.41(d) AND 12 U.S.C. § 2605(k)(1)(E)

**(Failure to state the specific reason for Shellpoint's determination for the Denial)**

61.     Nixon restates and incorporates all the statements and allegations contained in paragraphs 1 through 60 in their entirety, as if fully rewritten herein.

62.     "A borrower may enforce the provisions of [12 C.F.R. § 1024.41] pursuant to section 6(f) of RESPA (12 U.S.C. §2605(f))". 12 C.F.R. § 1024.41(a).

63.     "If a borrower's complete loss mitigation application is denied for any trial or permanent loan modification option available to the borrower pursuant to paragraph (c) of this section, *a servicer shall state in the notice sent to the borrower pursuant to paragraph (c)(1)(ii) of this section the specific reason or reasons for the servicer's determination for each such trial or permanent loan modification option* and, if applicable, that the borrower was not evaluated on other criteria." 12 C.F.R. § 1024.41(d) (emphasis added).

64.     A servicer of a federally related mortgage shall not "fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." 12 U.S.C. § 2605(k)(1)(E).

65.     No foreclosure sale of the Home has been scheduled so Nixon submitted the Application more than ninety (90) days prior to any scheduled sale.[3]

66.     The Denial stated that Nixon was ineligible for a "Standard Modification" because she did "not meet the requirements to qualify" but did not specify the requirement(s) that Nixon failed to meet. *See*, Exhibit 6.

67.     Shellpoint now maintains that the Application was denied because of the due-on-sale clause of the Loan, but did not advise Nixon of this fact in writing until more than five (5) months later via correspondence dated October 19, 2020. *See*, Exhibit 8.

68.     Shellpoint's failure to identify the specific reasons for which Nixon was ineligible for the Standard Modification through the Denial constitutes a violation of 12 C.F.R. § 1024.41(d) and is otherwise in violation of 12 U.S.C. § 2605(k)(1)(E).

69.     Shellpoint's actions are part of a pattern and practice of behavior in conscious disregard for Nixon's rights.

70.     Shellpoint's conduct as pled, *supra*, shows a conscious disregard for Nixon's rights.

71.     As a result of Shellpoint's actions, Shellpoint is liable to Nixon for statutory damages and actual damages as further described, *supra*. 12 U.S.C. § 2605(f)(1).

72.     Additionally, Nixon requests reasonable attorneys' fees and costs incurred in connection with this action. 12 U.S.C. § 2605(f)(3).

## COUNT TWO:
## VIOLATION OF 12 C.F.R. § 1024.41(c)(1)(ii) AND 12 U.S.C. § 2605(k)(1)(E)

### (Failure to notify Nixon of her right to appeal the Denial)

---

[3] The CFPB's official interpretation of 12 C.F.R. § 1024.41(b)(3) provides "[i]f no foreclosure sale has been scheduled as of the date that a complete loss mitigation application is received, the application is considered to have been received more than 90 days before any foreclosure sale." Supplement I to Part 1024.

73. Nixon restates and incorporates all the statements and allegations contained in paragraphs 1 through 60 in their entirety, as if fully rewritten herein.

74. "A borrower may enforce the provisions of [12 C.F.R. § 1024.41] pursuant to section 6(f) of RESPA (12 U.S.C. §2605(f))". 12 C.F.R. § 1024.41(a).

75. If a servicer receives a complete loss mitigation application at least ninety (90) days before a foreclosure sale, then "a servicer shall permit a borrower to appeal the servicer's determination to deny a borrower's loss mitigation application for any trial or permanent loan modification program available to the borrower." 12 C.F.R. § 1024.41(h)(1).

76. If a servicer receives a complete loss mitigation application more than thirty-seven (37) days before a foreclosure sale a servicer must:

> (i) Evaluate the borrower for all loss mitigation options available to the borrower; and
> (ii) *Provide the borrower with a notice in writing stating* the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage. The servicer shall include in this notice the amount of time the borrower has to accept or reject an offer of a loss mitigation program as provided for in paragraph (e) of this section, if applicable, and a notification, if applicable, *that the borrower has the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such an appeal and any requirements for making an appeal, as provided for in paragraph (h) of this section.*

12 C.F.R. § 1024.41(c)(1) (emphasis added).

77. A servicer of a federally related mortgage shall not "fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." 12 U.S.C. § 2605(k)(1)(E).

78.     No foreclosure sale of the Home has been scheduled so Nixon submitted the Application more than ninety (90) days prior to any scheduled sale.[4]

79.     The Denial did not notify Nixon that she had the right to appeal her Denial for the "Standard Modification".

80.     Shellpoint's actions in failing to advise Nixon of her right to appeal the denial within the Denial constitute a violation of 12 C.F.R. § 1024.41(c)(1)(ii) and is otherwise in violation of 12 U.S.C. § 2605(k)(1)(E).

81.     Shellpoint's actions are part of a pattern and practice of behavior in conscious disregard for Nixon's rights.

82.     Shellpoint's conduct as pled, *supra*, shows a conscious disregard for Nixon's rights.

83.     As a result of Shellpoint's actions, Shellpoint is liable to Nixon for statutory damages and actual damages as further described, *supra*. 12 U.S.C. § 2605(f)(1).

84.     Additionally, Nixon requests reasonable attorneys' fees and costs incurred in connection with this action. 12 U.S.C. § 2605(f)(3).

## COUNT THREE:
## VIOLATION OF 12 C.F.R. § 1024.35(e) AND 12 U.S.C. §§ 2605(k)(1)(C) AND (E)

### (Failure to reasonably investigate and properly respond to the NOE)

85.     Nixon restates and incorporates all the statements and allegations contained in paragraphs 1 through 60 in their entirety, as if fully rewritten herein.

86.     "A servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information

---

[4] The CFPB's official interpretation of 12 C.F.R. § 1024.41(b)(3) provides"[i]f no foreclosure sale has been scheduled as of the date that a complete loss mitigation application is received, the application is considered to have been received more than 90 days before any foreclosure sale." Supplement I to Part 1024.

that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred." 12 C.F.R. § 1024.35(a).

87. Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. § 1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower.

88. Pursuant to 12 C.F.R. § 1024.35(b)(11), the term "error" refers to any error, not otherwise specified in 12 C.F.R. §§ 1024.35(b)(1) to 1024.35(b)(10), committed in regards to the borrower's mortgage loan.

89. A servicer must respond to a notice of error by either:

(A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

(B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.35(e)(1)(i).

90. "A servicer of a federally related mortgage shall not...fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties." 12 U.S.C. § 2605(k)(1)(C).

91.     A servicer of a federally related mortgage shall not "fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." 12 U.S.C. § 2605(k)(1)(E).

92.     On or about October 6, 2020, Nixon sent the NOE to Shellpoint at the Designated Address and Shellpoint received the NOE at the Designated Address within a week thereof. *See*, Exhibit 7.

93.      Through the NOE, Nixon alleged that Shellpoint committed errors in relation to the Loan, specifically in Shellpoint's handling of the TPP and loss mitigation process at large, by:

    a.  Rejecting an attempted seventh payment by Nixon in furtherance of the terms of the TPP in May 2020;

    b.  Making misrepresentations that Nixon's loss mitigation file was closed for failing to return an assumption agreement;

    c.  Making misrepresentations about the loss mitigation process and the TPP by advising Nixon that Shellpoint would be sending an assumption agreement and permanent modification on numerous occasions; and,

    d.  By demanding a lump sum payment for payments due under the TPP from May 2020 through October 2020 in order to receive a permanent modification.

*See*, Exhibit 7.

94.     Shellpoint sent the Response on or about October 22, 2020. *See*, Exhibit 9.

95.     Shellpoint did not satisfy the requirements of 12 C.F.R. § 1024.35(e)(1)(i)(A) through the Response as Shellpoint did not admit that any errors occurred as alleged through the NOE. *See*, Exhibit 9.

96. Shellpoint did not satisfy the requirements of 12 C.F.R. § 1024.35(e)(1)(i)(A) through the Response as Shellpoint did not perform a reasonable investigation into the errors alleged through the NOE, as is evident from the face of the Response. *See*, Exhibits 7 and 9.

97. Shellpoint's statements through the Response that "Nixon is not the homeowner" and reliance upon a due-on-sale clause stating that "someone buying your home cannot assume the remainder of the mortgage on the original terms" are incorrect, misguided, and misleading as Nixon is the owner of the Home through the Transfer Documents and Nixon did not purchase or attempt to purchase the Home. *See*, Exhibits 2, 3, 4, 7 and 9.

98. Further, the Loan's due-on-sale clause is inapplicable as to the instant circumstances pursuant to the Garn-St. Germain Depository Institutions Act, which prohibits the application of a due-on-sale clause upon "a transfer to a relative resulting from the death of a borrower" or upon "a transfer where the...children of the borrower become an owner of the property". 12 U.S.C. § 1701j-3(d)(5); *see*, Exhibits 2, 3, and 4.

99. Shellpoint further denied making misrepresentations as to the loss mitigation process for the Loan stating that "Shellpoint's intention was not for [Nixon] to believe the loan modification was approved upon receiving the [TPP], as the [L]oan must go through additional verification before the final approval", but this statement, and the remainder of the response completely disregards and fails to mention other misrepresentations including that Nixon was advised on multiple occasions that Shellpoint would be sending an assumption agreement and permanent loan modification for execution and that Nixon was advised to make a lump sum payment of the amounts due in furtherance of the TPP since May 2020. *See*, Exhibits 7 and 9.

100. Shellpoint's actions in failing to correct or otherwise perform a reasonable investigation into the errors alleged through the NOE, and to provide a proper written response to

the same, constitute one (1) violation of 12 C.F.R. § 1024.35(e) and 12 U.S.C. §§ 2605(k)(1)(C) and (E).

101.    Shellpoint's actions are part of a pattern and practice of behavior in violation of Nixon's rights and the rights of other similarly situated borrowers and in violation of Shellpoint's obligations under Regulation X.

102.    As a result of Shellpoint's actions, Shellpoint is liable to Nixon for statutory damages and actual damages as further described, *supra*. 12 U.S.C. § 2605(f)(1).

103.    Additionally, Nixon requests reasonable attorneys' fees and costs incurred in connection with this action. 12 U.S.C. § 2605(f)(3).

## COUNT FOUR:
### VIOLATIONS OF THE FDCPA, 15 U.S.C. §§ 1692, *et seq*.

104.    Nixon restates and incorporates all the statements and allegations contained in paragraphs 1 through 60 in their entirety, as if fully rewritten herein.

105.    Nixon is a "consumer" as she is a natural person residing in Franklin County, OH and is obligated or allegedly obligated to pay on the Loan sought to be collected by Shellpoint. 15 U.S.C. § 1692a(3).

106.    Shellpoint engaged in the actions described, *supra*, in an attempt to collect a debt represented by the Loan.

107.    As outlined, *supra*, Shellpoint violated 15 U.S.C. § 1692e by using false or misleading representations to attempt to collect a debt during the loss mitigation process by repeatedly and continuously misrepresenting the status of the Application and the anticipated permanent modification, in sending conflicting and inaccurate information regarding the same, and in improperly claiming that a due-on-sale provision of the Loan prohibited a modification of the Loan.

108.    As outlined, *supra*, Shellpoint violated 15 U.S.C. § 1692f by using unfair or unconscionable means to attempt to collect a debt by repeatedly and continuously misrepresenting the status of the Application and the anticipated permanent modification, in sending conflicting and inaccurate information regarding the same, and in improperly claiming that a due-on-sale provision of the Loan prohibited a modification of the Loan.

109.    Due to Shellpoint's conduct, Nixon suffered actual damages, further described, *supra*.

110.    Shellpoint's actions directly and proximately caused Nixon to suffer from extreme emotional distress driven by the reasonable and legitimate fear that her Home would be sold at foreclosure sale despite her reasonable compliance with all of Shellpoint's requests through the loss mitigation process and her fulfilment of her obligations under the TPP which has resulted in frustration, loss of sleep, anxiety, depression, embarrassment, and other significant emotional distress.

111.    Shellpoint, because of these actions, is liable to Nixon for actual damages as further described, *supra*, statutory damages, and reasonable attorneys' fees and costs.

## COUNT FIVE:
## VIOLATIONS OF THE RMLA, R.C. 1322, *et seq*.,

112.    Nixon restates and incorporates all the statements and allegations contained in paragraphs 1 through 60 in their entirety, as if fully rewritten herein.

113.    "No person ... shall act as a … mortgage servicer … without first having obtained a certificate of registration from the superintendent of financial institutions for the principal office and every branch office to be maintained by the person for the transaction of business as a … mortgage servicer ... in this state." R.C. 1322.07(A).

114.    Shellpoint, as a mortgage servicer, is required to be registered with the Ohio Department of Commerce, Division of Financial Institutions under R.C. 1322.

115.    Shellpoint is a registrant under R.C. 1322, as the Ohio Department of Commerce, Division of Financial Institutions has issued it certificates of registration, License Nos. RM.803970.007-BR and RM.803970.008-BR.

116.    Nixon is a buyer as defined by the RMLA, as the Loan is serviced by Shellpoint, a mortgage servicer. R.C. 1322.01(H).

117.    A registrant, licensee, or person required to be registered or licensed under R.C. 1322, *et seq.* cannot:

> (B) Make false or misleading statements of a material fact, omissions of statements required by state or federal law, or false promises regarding a material fact, through advertising or other means, or engage in a continued course of misrepresentations; [or]
>
> (C) Engage in conduct that constitutes improper, fraudulent, or dishonest dealings[.]

R.C. 1322.40.

118.    Shellpoint, in omitting or misrepresenting facts throughout the loss mitigation process, failing to provide proper responses to the NOE, and failing to timely correct the errors asserted through the NOE, engaged in a continued course of misrepresentations by making false or misleading statements of a material fact. R.C. 1322.40(B).

119.    Shellpoint's conduct in improperly handling the loss mitigation process for the Loan and for omitting or misrepresenting facts throughout the same, failing to provide proper responses to the NOE, and failing to timely correct the errors asserted through the NOE constitutes violations of R.C. 1322.40(C).

120.     Shellpoint's conduct caused Nixon to suffer actual damages, as further described, *supra*.

121.     As a result of Shellpoint's conduct, Shellpoint is liable to Nixon for actual damages, as further described, *supra*, as well as reasonable attorneys' fees and costs incurred in connection with this action and punitive damages. R.C. 1322.52.

122.     A registrant, licensee, or person required to be registered or licensed under R.C. 1322, *et seq.*, is required to comply with all duties imposed by other statutes or common law and:

> (3) Act with reasonable skill, care, and diligence; [and]
> (4) Act in good faith and with fair dealing in any transaction, practice, or course of business in connection with the brokering or originating of any residential mortgage loan[.]

R.C. 1322.45(A).

123.     A registrant, licensee, or person required to be registered or licensed under R.C. 1322 cannot waive or modify its duties under R.C. 1322.45(A). R.C. 1322.45(C).

124.     Shellpoint's conduct in improperly handling the loss mitigation process for the Loan and for omitting or misrepresenting facts throughout the same, failing to provide proper responses to the NOE, and failing to timely correct the errors asserted through the NOE  constitutes violations of R.C. 1322.45(A)(3)-(4).

125.     As a result of Shellpoint's conduct, Shellpoint is liable to Nixon for actual damages, as further described, *supra*, as well as reasonable attorneys' fees and costs incurred in connection with this action and punitive damages. R.C. 1322.45(D).

### PRAYER FOR RELIEF

Plaintiff Nina N. Nixon prays that this Court enter its order granting judgment in their favor and against Defendant New Penn Financial, LLC d.b.a. Shellpoint Mortgage Servicing, as follows:

A.     An award of actual damages as to Counts One through Five;

B.  An award of statutory damages in the amount of Two Thousand Dollars ($2,000.00) for each of the three (3) violations of RESPA contained in Counts One through Three for a total of Six Thousand Dollars ($6,000.00);

C.  An award of statutory damages in the amount of One Thousand Dollars ($1,000.00) for the violations of the FDCPA contained in Count Four;

D.  For attorney's fees and costs as to Counts One through Five;

E.  For punitive damages as to Count Five;

F.  For such other relief which this Court may deem appropriate.

Respectfully submitted,

*/s/ Marc E. Dann*
Marc E. Dann (0039425)
Daniel M. Solar (0085632)
Brian D. Flick (0081605)
Michael A. Smith Jr. (0097147)
Dann Law
P.O. Box 6031040
Cleveland, OH 44103
Telephone: (216) 373-0539
Facsimile: (216) 373-0536
notices@dannlaw.com

*Counsel for Plaintiff Nina N. Nixon*

## JURY DEMAND

Plaintiff Nina N. Nixon hereby requests a trial by jury on all issues, with the maximum number of jurors permitted by law.

*/s/ Marc E. Dann*
Marc E. Dann (0039425)
Daniel M. Solar (0085632)
Brian D. Flick (0081605)
Michael A. Smith Jr. (0097147)
Dann Law
*Counsel for Plaintiff Nina Nixon*